May it please the Court, Brad Bogan for James Kenneth Ganzer. The question in this case is whether the government acted in good faith by obtaining and relying on a search warrant that it knew, or at least should have known, that the magistrate judge did not have the power to issue. And the reason the government wanted this warrant was so that it could distribute child pornography to anyone, anywhere in the world, who knew how to access the pornography website that the government had seized. And that's what the government did. But the government had a problem. The search method that it wanted to employ, the magistrate judge did not have the power to authorize. Now the case involves two parallel tracks that intersect at some point. First there's the FBI's investigation. They learned of this website called Playpen sometime in 2014. And during the investigation they received information from a foreign intelligence or law enforcement agency that the website was hosted on a server located in North Carolina. So they were able to seize the server and take control of the website. And then they moved the website to a government server located in the Eastern District of Virginia. But rather than shutting down the website, the government decided that it wanted to keep it up and running so that it could hopefully identify the users of the site, people who were downloading and uploading the child pornography. But they had a problem. The technique they wanted to use to identify those users required what was called a network investigative technique, or NIT for short. And what that would do is when users logged onto the website, the NIT, which was essentially a piece of malware, would send instructions to the computer that was accessing the site remotely and tell that computer to send information such as the IP address, information about the operating system on the accessing computer, so that the FBI could take that information and then hopefully go to the internet service provider and find the actual physical location of the computer that was accessing the website. Now that necessarily meant that it weren't authorizing that technique would allow the search of a computer located anywhere in the United States or anywhere in the world, for that matter, because at the time the FBI wanted to do this, they didn't know where the accessing computer was located. That was the whole point of this endeavor. And so they went to a magistrate judge in the eastern district of Virginia, where the server with the website was located, and got this warrant that allowed them to use the NIT and effectively deploy it worldwide. At that time, Rule 41 of the Federal Rules of Criminal Procedure did not authorize magistrate judges to issue warrants for searches of property or people outside of the district where the magistrate judge sat. Now, the government had recognized this problem before playpen even came into the picture. As early as 2013, the government knew that this was going to be a problem, because they had been denied a warrant by a magistrate judge in the southern district of Texas for an NIT that would operate largely the same way that the one ultimately did in this case. And the judge there found that what the government wanted to do was not authorized, or at least a magistrate judge could not issue a warrant for it because of the geographical limitations on the magistrate judge's authority in Rule 41. So in 2013, in September 2013, the government went to the Advisory Committee on the Criminal Rules asking for an amendment to Rule 41 that would authorize this type of search. And the reason that the government gave at that time was because on its face, Rule 41 did not authorize this. And so it would require either an amendment to the rule or the judicial creation of a new exception to the geographic limitations in Rule 41. And so at the time in 2015, when the government, January 2015, when the government sought the warrant, the rules changed, the amendment process had started, but had not completed. And so at that time, Rule 41 still did not authorize this type of warrant. Now, an amendment to the rule did become effective in December 2016, so that now, going forward, magistrate judges do have the power to issue these. But at the time that the government sought the warrant, the government knew or should have known that the magistrate judge could not do this. Mr. Bogan, as a — I got your name right, right? As a technical matter, just simply because I'm not familiar with this, as a technical matter, how does the search occur pursuant to the NIT warrant? So what happens is the website is located on something called the Onion Router, which is a network on the dark web. It's something that you wouldn't be able to access or even find just by running a search in Google, for example. The Onion Router network, or TOR, is a separate dedicated network that requires specialized know-how to access. It requires a user to download the TOR software, and what it does is it sends communications from the user's computer through a relay network of other volunteer computers elsewhere in the world. Ultimately, what that does is it anonymizes the source of the originating — Is the Onion server — forgive me if I get this wrong — is that what's located in the EDVA? No. What's located in Virginia is a government server that contains the website that they seized from North Carolina. And so the way that TOR operates is by the time the communication from the originating computer reaches the site, there's no way to go back through the chain to identify what that accessing computer was or where it's located. And so what the NIT did was whenever somebody would access Playpen using TOR, that person would have to log in with a username and a password, and then at that point, the NIT would be deployed from the website on the government server, and it would be able to go back through that chain to the accessing computer, and then it would extract certain information from that computer, including the IP address, which is a unique identifier for each computer on the Internet, information about the operating system that the computer was using, and some other information, and then send that back to the government server. In your view, is that the search? Yes. The extraction of the information from the accessing computer is the search, the deployment of the NIT technique. And I don't think the government takes any issue with the fact that this was, in fact, a search in this case. Is the IP address generally available without using — you just used the term dark web, I think. Is the IP address otherwise available when you use the computer generally? Like Judge Duncan, I'm asking because I don't know, and I'm not as familiar with the technology as probably most people. Right. My understanding is that yes, unless somebody is taking steps to anonymize their presence and their activities, which is the whole purpose of the TOR network, which was, in fact, originally developed by the U.S. Navy to allow secure government communications around the world, but which is now available publicly to anyone who has the TOR software. This first search out of — you say it's parallel. This first search is simply plucking the IP address off of the person using the computer to access this child pornography site. Is that correct? Right. The IP address — Nothing else. Nothing else in the computer. No files, no videos, photographs, any other content. Other information about the computer. So the operating system, be it Windows or a Mac environment, also the hardware that's being used, what type of hardware that computer contains, something called the MAC address, which is also something that is a unique identifier for that computer. But even with just that information alone, that's not sufficient to identify the location of the computer. That's why the FBI would then have to go to the internet service provider and say, we've got this IP address, we've got this other information, where is this computer? And so, again, because of the way that the TOR network operates in anonymizing one's activities on the internet, that information would not be available normally, absent — that information would not be available if a user was not using the TOR network, as I understand it. So because of the way that the users were using TOR, they were concealing that information. It wasn't just floating out there, as best I understand. I guess my colleagues may have more questions about the technical aspects, but for me, I mean, I guess the elephant in the room is, is it correct that every circuit court to have addressed this has found that the good faith exception to the warrant requirement applies? Yes, that's correct. And just last evening, the Sixth Circuit issued a decision, a case called United States v. Moorhead, and they did not reach the question of whether the warrant was valid or not, whether there was a Fourth Amendment violation. They just assumed that for the purposes of the case and held that the good faith exception applied. So tell me why they're all wrong. It would turn the notion of good faith on its head to apply it in a situation where, as here, the government knew or should have known that the magistrate judge did not have the authority to issue the warrant that the government was asking for. And given the nature of the government's conduct in this case, I mean, the government made a deliberate and conscious decision to distribute child pornography worldwide to anybody who knew how to access it, all for the purpose of identifying people who were downloading and uploading child pornography. So the government found it necessary to commit a serious crime in order to catch criminals. And I know that sometimes the government has to go undercover to, you know, catch to infiltrate drug trafficking organizations or gun trafficking organizations. But generally, the government does not actually create the very harm that it is seeking to prevent by prosecuting people. And so for that reason, I don't think that the Court can say that the government is acting in good faith here. So, look, now, are we trying to deter — who are we trying to deter through the — through, you know, the assessing the good faith exception? Are we trying to deter magistrates or officers? No. Not magistrates, but typically it's referred to as law enforcement. But here — and, of course, the idea is that we don't want the criminal to go free because the constable has blundered. Well, in this case, it's the FBI who's the constable. But they weren't acting alone. They worked in close consultation with the Department of Justice to get this warrant. And so it isn't a situation where the agent just made a mistake and then the magistrate did as well. The government manufactured this problem by seeking a warrant to do something that it was asking for an amendment to the rule to authorize, because at the time the rule did not authorize that. Well, that's one view, I guess. Another view might be the way the rules used to be, it was unclear whether such a warrant could issue. The government did the right thing by seeking an amendment to the warrant to clarify the situation. But that doesn't necessarily mean that it was acting in bad faith before that. It might have — I mean, weren't there certain theories that might have justified this? I mean, didn't — isn't there the possibility that they might have thought, you know, maybe the tracking aspect of Rule 41 could have justified this? Well, and that was one argument that the government made, but that's, I think, a very difficult argument to sustain if you look at the text of Rule 41 and the definition of a tracking device. Rule 41 cross-references the definition of trafficking device in 18 U.S.C. Section 3117, and it's defined as an electronic or mechanical device which permits the tracking of the movement of a person or object. Here, the NIT was not tracking the movement of anything. All it was doing was seeking information that the government could then take to identify the location of the computer. So there was no — there were no people or property that were moving here, and therefore nothing that was being tracked. So yes, that's an argument the government made. It's an argument that some district courts agreed with. But it's very telling that at the time of the amendment process, the government said on its face that Rule 41 did not authorize this. And in terms of deterrence going forward, it shouldn't matter that the rule has now been amended and this — this warrant would be okay now, because technology is constantly going to be overtaking the law. It's just the nature of the law that it's not going to be able to keep up. And to say that the government acted in good faith here is to say that in these situations where it becomes unclear, the government's allowed to push the envelope and find out just how far it could go. But the Constitution protects the rights of individuals. The Fourth Amendment is not there to allow the government to constantly expand its authority to search. It says that warrants should not issue upon probable cause. It creates a presumption that warrants are required. And here, this warrant was essentially no warrant at all because the magistrate judge did not have the power to issue it. All right. Thank you, Mr. Bogan. You've saved time for rebuttal. Mr. Durbin? Good morning. Mr. Durbin for the United States. How many Fifth Circuit arguments for you, Mr. Durbin? This may be 80. I'm not sure. I lost count a while back. All right. It's been a while. I've had some other jobs in the interim. But it's good to be back. We had some earlier in the week who was on about number 70. So you're doing — you're doing well. I will see if I've still got it. The case, I think, is about good faith. I think — I think, Judge Duncan, you've hit what the issues are. The issue, I think, the primary issue is — and eight circuits have now looked at this — they've all gone through or they've all considered, they haven't all resolved, whether or not it was a tracking warrant. None of the circuits have found it was a tracking warrant, but a number of Under the circumstances of this case, I think — first of all, it's a unique case. I don't think it's going to rise again because the rule has been amended. This was a particular investigative technique that was used for this child pornography operation. It is the case that the government seized the server from North Carolina, took it to Virginia, and did operate it for a period of time. They operated it under a wiretap order that was issued by a district court in eastern Virginia. It wasn't like the government was just out doing child pornography on its own. It had gotten court supervision so that they could intercept what the communications were back and forth. And in doing that, they realized they couldn't identify who the users were that were making access through the dark web to this server. And that was part of the objective of the investigation, was to find out who is making access to this. And it was a complicated process to get into the server. You had to download Tor software. You had to access — you had to find out what the website address was for this particular website. It was not available through a Google search. It was generally available perhaps through other child pornography sites or through chats and those sorts of things. Then you had to specifically access it, and you had to put in a username and an email address. But the advice from the website was, don't use your real username and don't use your real email address, because it could be tracked back to you in some way. So the whole thing took the users some considerable effort to get into. And the government, under the technology, just couldn't access it. And so what they resorted to was, under the supervision or the authority of the court, was to use this network investigative technique. I think all the courts that have considered it have considered it to be a search, because it went out to these computers ultimately to find specific information. It was very specifically particularized information that identified the computer. It took additional investigation to figure out where those computers were, because once they got the ISP, then they still had to go to the IP address. They still had to go to the internet service provider with separate process to figure out where the computer was actually located. And then in this case, it was located in the Austin area, and a second search warrant was obtained for the purposes of actually searching and seizing that computer. The issue, I think, is if you consider good faith, and I think that's what this case turns on, is what's the deterrence that's going to be accomplished if this court says that there was not good faith? Now, the Supreme Court has said, and all of the circuits that have considered it, and this court as well has considered good faith, it's to deter police conduct going forward, not past conduct, but going forward. And I would submit to you that this circumstance will not repeat itself, because now the rule is very clear. At the time, I'm not sure that the rule was quite so clear as counsel suggested it was. In hindsight, after eight circuits have now resolved it, yeah, it looks like pretty much the rule didn't specifically address this particular circumstance. But I think that the government, in good faith, was exploring several avenues. One avenue was, what are the courts going to do? Are the courts going to construe the rule to cover this kind of warrant? And second of all, let's go through the amendment process for the rules to specifically address this type of investigative technique, because we may use it again, that one magistrate judge in a published opinion in 2013 made the decision that they thought that a different investigative technique, it was also an invasive technique, but it was a technique that was actually going to allow video recording of the users of the target computer they were trying to find in that case. And additionally, they didn't have the target computer identified in such a way that they knew they could go directly to it as they could the users that were the targets of this particular investigation. It involved a fraud offense, and there was some anonymizing, and they were going to have to look at a number of computers before they could even be certain that they had the right one. And there was some concern on the magistrate judge's part that that was going to be terribly invasive. It was in the nature of basically a wiretap that was going to be done through the auspices of a warrant. So while the 2013 case put the issue or raised the issue, I think the Department of Justice did exactly what you would want to encourage them to do, explore what the courts are going to do with it, and at the same time, explore, as it were, the legislative remedy that's going to fix it. And both of those things have been done. In the course of this, the courts have resolved what the legal issue is. I don't think it was quite as clear as counsel suggests. As he said, and as our materials indicate, a number of district courts found that this was analogous to a tracking warrant. It was not technically compliant with the rule, but it was in the nature of it. And I don't think the magistrate or the government or the investigators were beyond the kin or so on notice that this was an improper warrant that it should be struck down on some basis of bad faith. And finally, when you get to the end of the day, if you suppress this, you're not deterring anything because it isn't going to happen again. And good faith is about deterrence of the police. And because the rule has changed, there's no deterrence to be had. There is no effect to be gained from applying the court created exclusionary rule in this particular circumstance. What is the police conduct that would be deterred by this? Talking with prosecutors to determine whether or not this is a lawful warrant. Exploring with the courts to determine what the legality of the warrant is going to be in the long run. Surrendering because we've got a technological problem. We surrender to the criminals and say, ah, the rule doesn't cover it, so we're not going to do anything. We'll just have to wait around and see if we can convince somebody to change the rule. I think under the circumstances, there's nothing else the government could have done that's responsible and that application of the exclusionary rule in this case would create actually the opposite result of what the court would intend. It would be almost capricious in a way because I'm not sure that the government could have done anything else to accomplish this and to have done it in such a way that it lays all the issues out. The government was transparent throughout. There was no secrecy about what was being searched. The warrant itself was captioned in the matter of search of unknown computers. And there was nothing hidden from the magistrate judge, nothing hidden from the courts throughout. So I would urge the court to follow the eight sister circuits that have already considered this and to affirm the conviction and affirm the lower court's finding that the warrant was obtained in good faith. Thank you, Mr. Durbin. Are there any questions? Thank you. Mr. Durbin, you say time for rebuttal. The government says there's nothing to deter here because the rule has been changed. But we don't know what the next situation is going to be at this point in time. I was going to ask you about that. So let's imagine there is some technological, I hesitate to say advance, some further technological wrinkle. What are the police supposed to do the next time? What's law enforcement supposed to do the next time when there has been some sort of change in the technology, they find themselves in a similar position? What are they supposed to do? Well, they can do what they did here. They can go to the rules committee and make a change. If that change is within the power of the rules committee can do, they can go to Congress and seek a law that will authorize it. What the government should not be able to do is decide, well, we're just going to go with it anyway and let the chips fall where they may, see how it plays out. And again, consider what the government did here. They didn't go undercover to infiltrate a drug trafficking organization or anything like that. They distributed child pornography to potentially thousands or hundreds of thousands of people around the world. And the whole point of criminalizing child pornography is to try to undermine the market  Well, here the government was an active participant in the market. It was actively distributing it. Is there anything about this case that distinguishes it from the other cases that have been considered by circuits? Is there any particularity of this case that you want to draw our attention to? As far as the particular facts, no. As far as the relevant facts are concerned, the facts surrounding the circumstances of the warrant. Okay. The government says, what else could we have done? Well, they could have shut the site down, and they decided not to. If there are no further questions, I ask the court to reverse the district court and vacate Mr. Gadger's conviction. Thank you, Mr. Bogan. Thank you. Your case is under submission.